IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

LAURA WILSON                                                                              PLAINTIFF

   v.      Civil No. 2:14-cv-2206

CAROLYN W. COLVIN, Commissioner
Social Security Administration                                                              DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

  Plaintiff, Laura Wilson, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under the provisions of Titles II and XVI of the Social Security Act ("Act"). Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), the Honorable P.K. Holmes referred this case to the undersigned for the purpose of making a report and recommendation. In accordance with that referral, this Court enters the following report and recommendation.

**I. Background:**

  Plaintiff protectively filed her applications for DIB and SSI on March 8, 2012, alleging an onset date of December 30, 2011, due to mood disorder and attention deficit hyperactivity disorder ("ADHD"). (Tr. 18, 176, 216). For DIB purposes, Plaintiff retained insured status through December 31, 2011. (Tr. 20, Finding 1). Plaintiff's application was denied initially and on reconsideration. An administrative hearing was held on January 17, 2013, at which Plaintiff appeared with counsel and testified. (Tr. 34-82). A vocational expert ("VE") was also present and testified. (Tr. 75-80).

On April 26, 2013, the Administrative Law Judge ("ALJ") entered an unfavorable decision. (Tr. 18-29). In this decision, the ALJ determined Plaintiff had the following severe impairments: "attention deficit hyperactivity disorder, pervasive developmental disorder/Asperger's syndrome, mood disorder/adjustment disorder with mixed anxiety and depressed mood, obsessive-compulsive disorder and schizoid personality traits." (Tr. 20, Finding 3). After reviewing all of the evidence presented, however, the ALJ determined Plaintiff's impairments did not meet or equal the level of severity of any impairment listing. (Tr. 20-23, Finding 4).

The ALJ next evaluated Plaintiff's subjective complaints and determined her RFC. (Tr. 23-28). The ALJ first evaluated Plaintiff's subjective complaints and found she was not entirely credible. The ALJ then found Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations:

> She can do work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote with few variables and little judgment involved and the supervision required is simple, direct, and concrete.

(T. 23, Finding 5).

Based on the testimony of the VE, the ALJ determined Plaintiff could perform her past relevant work ("PRW") as a poultry eviscerator and compression molding machine tenderer. (Tr. 28-29, Finding 6). The ALJ then concluded Plaintiff was not disabled. (Tr. 29, Finding 7).

On June 17, 2013, Plaintiff requested the Appeals Council review the ALJ's unfavorable decision, which denied the request on August 6, 2014. (Tr. 1-3). On September 30, 2014, Plaintiff filed the present appeal. (ECF No. 1)[1]. Both Parties have filed appeal briefs, and the case is ready

---

[1] The docket numbers for this case are referenced by the designation "ECF No. __." The transcript pages for this case are referenced by the designation "Tr."

for decision. (ECF Nos. 11, 12).

## II. Evidence Presented:

Plaintiff saw Dr. Norman Snyder on May 3, 2011, who was her treating psychiatrist during childhood, for ongoing problems with obsessive compulsive disorder, attention, and anxiety. (Tr. 273). At the visit, Plaintiff was happy, communicated well, showed good thought process, demonstrated vocabulary and intelligence in the low-average range, behaved without anxiety, but seemed easily distracted. (Tr. 273). Dr. Snyder assessed Plaintiff with Asperger's syndrome and adjustment disorder, assigned a GAF of 50, and prescribed nortriptyline. (Tr. 273-274).

On September 26, 2011, Plaintiff established treatment with James Gattis, an advanced nurse practitioner at the Western Arkansas Guidance and Counseling Center, for anger and anxiety problems. (Tr. 243). Plaintiff was assessed with personality disorder and adjustment disorder, and assigned a GAF of 60. (Tr. 243-246).

On October 13, 2011, Plaintiff met with Mr. Gattis, who noted Plaintiff had not been taking her nortriptyline. (Tr. 239-240). Plaintiff reported an increase in depression over the past year since giving birth to her child, and a lifetime tendency to isolate herself or get angry when demands are made of her. (Tr. 239). Plaintiff reported she made "fairly good grades" in high school, attended two years of college, had many friends, and had never had disciplinary problems. (Tr. 240). Mr. Gattis noted Plaintiff had good affect, speech, and cognition; had normal thought content, judgment, and insight; and demonstrated normal working memory, concentration, and vocabulary skills. (Tr. 241). He opined Plaintiff's intelligence was in the average range with "some hint of a pervasive developmental disorder," diagnosed Plaintiff with mood disorder, ADHD, and pervasive

developmental disorder, and assigned a GAF of 55. (Tr. 241). Mr. Gattis prescribed Celexa, Vistaril, and therapy. (Tr. 241-242).

Following the visit with Mr. Gattis, Plaintiff re-established care with Dr. Snyder because of Plaintiff's concerns Mr. Gattis did not think there was anything wrong with her and perceived her as "just lazy." (Tr. 325). In a letter dated February 17, 2012, Dr. Snyder noted he had been her treating psychiatrist until May 2010 when Plaintiff discontinued care. (Tr. 324). According to Dr. Snyder, when Plaintiff reestablished care he recommended Plaintiff apply for disability. (Tr. 324). Dr. Snyder opined Plaintiff had trouble maintaining her personal care and struggled with consistent treatment for financial reasons. He further wrote:

> if she can succeed in obtaining disability coverage she will be able to return to therapy. If she is unable to do so I would be concerned about her ability to maintain any future employability, her relationships with her own family suffering, and even potentially with her ability to adequately provide for the needs of her child.

(Tr. 324). Dr. Snyder explained to Plaintiff the purpose of his letter was to justify an application for Medicaid and disability benefits so she could afford therapy and medication. (Tr. 325).

Plaintiff had a one-year follow-up with Dr. Snyder on May 3, 2012. (Tr. 287-289). According to Dr. Snyder, Plaintiff's anxiety and depression were situational and related to the breakup of her marriage, and she was showing greater confidence and independence. (Tr. 287). Dr. Snyder noted her behavior and cognition was normal during the visit, assigned a GAF of 50, and prescribed nortriptyline. (Tr. 288-289). On May 31, 2012, Plaintiff had a follow-up with Dr. Snyder. According to Dr. Snyder, Plaintiff appeared "calm, happy, and attentive" during the visit, showed proper thought content and normal judgement, and exhibited no signs of depression, although she was fidgety during her visit. (Tr. 285-286). Dr. Snyder assessed Plaintiff with

cognitive functioning in the normal range and prescribed Buspar for anxiety. (Tr. 285-287). Dr. Snyder again noted he encouraged Plaintiff to pursue disability so she could afford treatment, and addressed a concern his February letter was causing Plaintiff problems with her child custody situation. (Tr. 285). He opined:

> [Plaintiff] has demonstrated substantial abilities to be responsible, and to have demonstrated capabilities to her child. Her status regarding disability must only be considered in the context of allowing her to maintain the care that her conditions warrant, which allows her to function, maintain stable mood, and to contend, with appropriate support, with the vicissitudes of her life.

(Tr. 285).

On March 5, 2012, Nurse Gattis wrote a one-paragraph letter and opined Plaintiff's primary diagnosis was pervasive developmental disorder, she was not able to maintain gainful employment, and she could not function without supervision. (Tr. 236).

Dr. Terry Efird, a State psychiatrist, examined Plaintiff on May 14, 2012. (Tr. 248-251). Plaintiff reported she had ADHD, Asperger's, and was highly introverted, but denied depression and panic attacks. (Tr. 248). Plaintiff stated her medications were beneficial and did not cause side effects. (Tr. 248). She endorsed an ability to take care of her daughter and complete chores, and reported she made B's and C's as a student, although she was provided additional time to complete exams. (Tr. 248-249). Plaintiff also stated she never had problems with coworkers and supervisors at her previous jobs, although she had not worked in the past two years since becoming pregnant. (Tr. 249). Dr. Efird noted Plaintiff had normal mood, affect, speech, cognition, memory, and thought process during the exam. (Tr. 249-250). He assessed Plaintiff with "adjustment disorder, with mixed anxiety and depressive mood," and assigned a GAF score of 60-70. (Tr. 250). Dr Efird opined Plaintiff had the cognitive ability to perform basic work like tasks, had no problems with

persistence during the exam, was able to persist on tasks if desired, and could perform work-like tasks within an acceptable time frame. (Tr. 250-251).

Dr. Abesie Kelly, a State non-examining psychiatrist, submitted a mental RFC assessment on May 15, 2012, and opined Plaintiff had no restrictions in her activities of daily living; mild difficulties in social functioning and concentration, persistance, or pace; no episodes of decompensation; and no severe impairments. (Tr. 255, 265, 267). Dr. Winston Brown affirmed Dr. Kelly's opinion on July 30, 2012. (Tr. 281).

Dr. Dawn Doray, a psychiatrist, submitted a psychological evaluation based on two visits with Plaintiff in June and July 2012 as part of Plaintiff's child custody dispute with her husband. (Tr. 328). Dr. Doray noted Plaintiff had a pleasant attitude, good persistence, and completed tasks in a normal time frame, but made fleeting eye contact and had an immature personality. (Tr. 329). During the visits, Plaintiff reported an improvement in anxiety and depression since the separation with her husband, an obsession with collecting wolf and dragon items, problems interacting in crowds, and memory problems. (Tr. 333). Dr. Doray indicated Plaintiff had "minimal to mild" situational anxiety related to her child custody and divorce proceedings and normal cognitive function, but antisocial, inattentive, and compulsive tendencies consistent with her ADHD and Asperger's diagnoses. (Tr. 333-334, 339). In tests administered by Dr. Doray, Plaintiff's reading ability was average and placed her at the 11th grade reading level. (Tr. 332). Her IQ score was in the high-average range in perceptive reasoning, average in processing speed, low-average in verbal reasoning and working memory, and 95 overall. (Tr. 331-332). Dr. Doray also observed Plaintiff with her daughter, and assessed they had good interactions and Plaintiff demonstrated appropriate cognitive capacity as a parent. (Tr. 336-339). She opined Plaintiff's "current functioning level is

safe and appropriate ... [she] has the ability to parent independently without constant supervision." (Tr. 340).

On August 7, 2012, Plaintiff had a follow-up with Dr. Snyder, and reported problems with frustration and attentiveness. (Tr. 345). Dr. Snyder noted Plaintiff had a happy attitude; normal speech; no difficulty with naming objects and repeating phrases; logical thinking, but some problems with abstract thinking; became easily distracted during the visit; showed good memory; and showed borderline cognitive functioning. (Tr. 345). Dr. Snyder prescribed Buspar for anxiety and Adderall for ADHD. (Tr. 346). On October 2, 2012, Plaintiff saw Dr. Snyder again, who noted Plaintiff came to the visit with her daughter, was calm with appropriate affect, reported no depression or anxiety, and no compulsive thoughts. (Tr. 349). Dr. Snyder opined Plaintiff's "attention span is longer ... tasks that require sustained mental effort seem less likely to be avoided ... she seems less distractable." (Tr. 349). Dr. Snyder noted that his exam showed Plaintiff's "associations are intact, thinking is logical and content is appropriate ... her cognitive functioning, based on vocabulary and fund of knowledge, is intact and age appropriate and she is fully oriented." (Tr. 349).

Plaintiff saw Dr. Snyder again on October 12, 2012, who noted Plaintiff "was doing well, and is without evidence of side effects due to medications." (Tr. 348). Dr. Snyder discontinued Buspar, continued Adderall, and recommended counseling for mood and attention issues. (Tr. 348). On January 31, 2013, Plaintiff had a follow-up with Dr. Snyder, who noted "with medication, ... her attention span is longer, she seems to be listening better when spoken to directly, she is less disorganized, she reports 'it is easier to cope,' she seems less distractable, she still requires reminders to do things, [and] she has maintained some systems of reminders that she can write down and leave [for] herself." (Tr. 350). He assigned Plaintiff a GAF of 50, suggested she could either work or

parent (but not concurrently), stated she needed disability to be able to afford her medications, and continued her Adderall. (Tr. 352-353).

Dr. Snyder submitted a Medical Source Statement dated February 8, 2013 and opined Plaintiff had a marked to severe limitation in her ability to be reliable and independent; she had moderate to severe limitations in memory and understanding; she had moderate to severe limitations in her ability to concentrate and persist; she had marked to severe limitations in her adaptive functioning; and her her social functioning was moderately to severely limited without medications. (Tr. 341-343). Dr. Synder commented on Plaintiff's problems with social interaction and social cues, impulsive behavior, anxiety with constantly changing routine, difficulties staying focused an organized, and reliance on a supportive network. (Tr. 343). According to Dr. Snyder, Plaintiff responded well to support, structure, and education, but "her role as a parent precludes considerations of work as the simultaneous demands of work and parenthood are likely to exceed her adaptive capacity." (Tr. 344).

On May 15, 2013, Plaintiff saw Dr. Robert Spray, a psychiatrist, for a psychological evaluation. According to Dr. Spray, Plaintiff reported back problems, an inability to lift more than twenty pounds, concentration problems, irritability, and problems with social skills. (Tr. 354). Plaintiff also stated she had two years of college coursework in computer programming and stated she was applying for disability because she "wants to be the best mom I can be -- 'til she is able to go to school." (Tr. 354). Dr. Spray noted Plaintiff reported no problems with self-care; she went shopping independently and was able to manage her own money; enjoyed activities such as playing games, taking care of her pets and caring for her daughter; had some problems socializing, but no problems interacting with others at her previous work positions. (Tr. 355). Dr. Spray noted Plaintiff

exhibited good thought content, memory recall, was cooperative, and had a euthymic mood with good affect. (Tr. 357). Dr. Spray assessed Plaintiff with adjustment disorder, ADHD, and pervasive developmental disorder, and assigned a GAF of 50. (Tr. 360).

Dr. Spray submitted a Medical Source Statement dated June 5, 2013, and opined Plaintiff had marked to severe limitations in her ability to be independent and reliable; moderate to severe limitations in memory and understanding; marked to severe limitations in concentration and persistence; moderate to extreme limitations in adaptive functioning; and moderate to severe limitations in social functioning. (Tr. 361-364).

**III. Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance, but it is enough a reasonable mind would find it adequate to support the Commissioner's decision. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record to support the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record to support a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the

evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether a claimant suffers from a disability, the Commissioner uses a five-step sequential evaluation.  She determines: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the RFC to perform her PRW; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.  20 C.F.R. §§ 404.1520(a)-(f)*; Cox*, 160 F.3d at 1206.  The fact finder only considers Plaintiff's age, education, and work experience in light of her RFC if the final stage of this analysis is reached.  *See* 20 C.F.R. §§ 404.1520, 416.920.

**III.    Discussion**:

Plaintiff argues: (1) the ALJ erred by not considering Listing 12.10; (2) the RFC was not based on substantial evidence because the ALJ did not give proper weights to medical opinions; and (3) the ALJ did not set forth the demands of Plaintiff's PRW with specificity.  (ECF No. 11 at 12-20).

**A. Listing 12.10**

Although the ALJ did not specifically cite Listing 12.10 in his decision, he referred to the mental disorders listings, discussed the evidence in detail, and evaluated whether Plaintiff met the "Paragraph B" criteria, which applies to Listing 12.10.  (Tr. 21-23).  "There is no error when an ALJ

fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). The ALJ appropriately discounted Dr. Snyder's Medical Source Statement, and concluded, based on Plaintiff's activities and the examinations of Dr. Efird and Dr. Doray, Plaintiff had mild difficulties in the activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation. (Tr. 21-22).

Plaintiff has the burden of establishing that her impairment meets or equals an impairment set out in the Listing of Impairments. *See Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990). Although Plaintiff was diagnosed with Asperger's and pervasive development disorder, a diagnosis is not disabling per se. There must be a functional loss establishing an inability to engage in substantial gainful activity. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990). Plaintiff fails to show her impairment was limiting enough to meet the listing.

Listing 12.10 for Autistic Disorder and Other Pervasive Developmental Disorders sets forth the criteria as:

> A. Medically documented findings of the following:
>     1. For autistic disorder, all of the following:
>         a. Qualitative deficits in reciprocal social interaction; and
>         b. Qualitative deficits in verbal and non-verbal communication and in imaginative activity; and
>         c. Markedly restricted repertoire of activities and interests;
> OR
>     2. For other pervasive developmental disorders, both of the following:
>         a. Qualitative deficits in reciprocal social interaction; and
>         b. Qualitative deficits in verbal and nonverbal communication and in imaginative activity;
> AND
> B. Resulting in at least two of the following:
>     1. Marked restrictions of activities of daily living; or
>     2. Marked difficulties in maintaining social functioning; or
>     3. Marked difficulties in maintaining concentration persistence or pace; or

    4. Repeated episodes of decompensation each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

  Plaintiff references test results from elementary school and the records and Medical Source Statement from Dr. Snyder as evidence she meets Listing 12.10. (ECF. No. 11 at 12-13; Tr. 291-295, 312-322, 341-343). Beyond being stale, Plaintiff's elementary records indicate her IQ was low-average to average. (Tr. 295, 312). Dr. Snyder's Medical Source Statement suggests severe to extreme communication deficits and problems with social interaction, which the ALJ acknowledged, but appropriately discounted as internally inconsistent and unsupported by other evidence in the record. (Tr. 21-22, 26-27). This evidence, as well as the rest of the record, is not sufficient to meet Plaintiff's burden at step three because it does not show Plaintiff meets all the criteria in a Listing. *See Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010).

  A review of the record shows Plaintiff does not meet the "A" criteria of Listing 12.10. Evidence shows Plaintiff is capable of meaningful social interaction. For instance, Plaintiff reported she had no problems interacting with coworkers and supervisors while employed. (Tr. 240, 249, 355). Medical notes and Plaintiff's testimony show Plaintiff interacted positively with her child, attending church weekly, and visited friends. (Tr. 62-65, 68, 206). The record also does not show severe levels of verbal and non-verbal communication deficits. The evaluation of Plaintiff's IQ, reading, and verbal skills by Dr. Doray showed Plaintiff was in the normal range. (Tr. 331-332).

  The record also does not reflect a marked restriction in activities and interests. Plaintiff's hobbies include reading, watching tv, playing Magic the Gathering with friends, and playing computer games. (Tr. 68, 71, 74, 183, 355), She spends time taking care of her daughter, sees family and friends, and attends church. (Tr. 58, 62, 64-65, 240, 249).

Similarly the record does not support a finding that the "B" criteria is met. Plaintiff reported she could complete chores, take care of her daughter independently, and plans to return to college once he daughter is old enough. (Tr. 58-60, 354). While Dr. Snyder stated Plaintiff could either work if she was not a parent, and his notes indicate Plaintiff's attitude and concentration improved as long as she maintained her medications. (Tr. 344, 348-349). The examinations of Dr. Efird and Dr. Doray also support the ALJ's finding Plaintiff's activities are not markedly restricted, and she does not have marked problems with concentration, persistence, or pace. (Tr. 248-251, 328-340).

Accordingly, the Court finds no basis for reversal on this issue.

**B. RFC**

Prior to Step Four of the sequential analysis in a disability determination, the ALJ is required to determine a claimant's RFC. *See* 20 C.F.R. § 404.1520(a)(4)(iv). This RFC determination must be based on medical evidence that addresses the claimant's ability to function in the workplace. *See Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004). The ALJ should consider "'all the evidence in the record' in determining the RFC, 'including the medical records, observations of treating physicians and others, and an individual's own description of her limitations.'" *Id.* (quoting *Krogmeier v. Barnhart*, 294 F.3d 1019 (8th Cir. 2002). The Plaintiff has the burden of producing documents and evidence to support her claimed RFC. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Cox*, 160 F.3d at 1206.

The ALJ, however, bears the primary responsibility for making the RFC determination and for ensuring there is "some medical evidence" regarding the claimant's "ability to function in the workplace" that supports the RFC determination. *Lauer v. Apfel*, 245 F.3d 700, 703-04 (8th Cir. 2001). This Court is required to affirm the ALJ's RFC determination if the determination is

supported by substantial evidence on the record as a whole. *See McKinney v. Apfel*, 228 F.3d 860, 862 (8th Cir. 2000).

Plaintiff believes the ALJ erred by discounting Dr. Snyder's Medical Source Statement and Mr. Gattis's opinion. (ECF No. 11 at 16-17).

After acknowledging Dr. Snyder as a treating physician, the ALJ discounted the opinions in Dr. Snyder's Medical Source Statement because they were not consistent with his treatment records and the record as a whole. (Tr. 26). The ALJ discussed Dr. Snyder's notes from February and May 2012, which showed Plaintiff's conditions had improved with treatment. Her attention span and focus had increased, she needed less guidance, her cognitive functioning and memory was better, and she was doing well overall. (Tr. 26). The ALJ addressed Dr. Snyder's second letter, which described Plaintiff's ability to organize, set priorities, and cope well with stress. The ALJ also highlighted Dr. Snyder's decision to discontinue Buspar, and January 2013 notes showing Plaintiff was focused, attentive, organized, and was able to manage her affairs so long as she maintained her medications. (Tr. 27). The ALJ discounted Dr. Snyder's opinion Plaintiff could not work while parenting and noted:

> It appears Dr. Snyder presents the dilemma that the claimant would have to choose between her child and working. That opinion is given little weight. As was noted above, the claimant has worked at the substantial gainful activity level in the past and only lost her job due to a layoff and not due to her symptoms or impairments. It is also inconsistent with his statements that the claimant's condition improved and that she was able to manage her child's behavior well with treatment. (Tr. 27).

An ALJ may discount a treating physician's opinion if other medical assessments are supported by superior medical evidence, so long as the ALJ gives good reasons for the weights assigned. *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (citing 20 C.F.R. §

404.1527(d)(2)).  The ALJ appropriately discounted the extreme limitations contained in Dr. Snyder's Medical Source Statement because they were inconsistent with his own treatment notes, internally inconsistent, and not supported by the rest of the record.  While the opinions of treating physicians are entitled to special weight, they are not automatically controlling, and conclusory opinions are entitled to no weight. *See Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)("A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight.").  Here, the ALJ gave good reasons for the weight he assigned to Dr. Snyder's Medical Source Statement and other evidence from his treatment.  The Court also notes the record documented Dr. Snyder's motivation to support Plaintiff's disability application, which casts some doubt on the credibility of the opinions in his Medical Source Statement, given that those opinions were not consistent with his treatment notes or his earlier letter.

The ALJ also addressed Nurse Gattis's opinion, but gave it "little weight" because Mr. Gattis "only saw [Plaintiff] two times in September and October 2011 before writing his letter in March 2012." (Tr. 26).  The ALJ also properly highlighted the differences between the opinions in the letter and Mr. Gattis's treatment notes. (Tr. 26).  The ALJ permissibly gave less weight to Nurse Gattis's opinion based on his short-term treatment relationship with Plaintiff and the vague and conclusive tone of his letter.  *See e.g., Holmstrom v. Massanari*, 270 F.3d 715, 720-721 (8th Cir. 2001); *see also Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996)("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements.").

The record as a whole indicates Plaintiff's mental impairments were accounted for in the ALJ's RFC determination. Dr. Snyder's and Dr. Doray's notes indicate once Plaintiff's re-established medications, her attention, concentration, mood, and organizational abilities improved. Conditions controlled by medications are not disabling. *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009). Dr. Snyder and Nurse Gattis's opinions suggest a need for constant supervision, but the evidence shows she attended two years of college at the University of Arkansas Ft. Smith, and she independently found and held jobs at more different employers, which she left for reasons unrelated to her disability. (Tr. 42, 46, 49, 51, 66, 73, 192-199). Plaintiff's record of employment strongly suggests the ability to work since there is no evidence of deterioration and her physicians opined she is capable of working if not parenting. *See Schultz v. Astrue*, 479 F.3d 979, 982-983 (8th Cir. 2007). It is also significant Plaintiff left her job for reasons unrelated to her impairments. *See Depover v. Barnhart*, 349 F.3d 563, 566 (8th Cir. Iowa 2003)(stating evidence Plaintiff left work for non-medical reasons suggests that Plaintiff's impairments were not as severe as alleged). In addition to Plaintiff's treatment notes and self-reported activities, Dr. Efird, and Dr. Doray's examinations are consistent with the non-exertional limitations formulated by the ALJ.

Based on the foregoing, the undersigned finds there is substantial evidence to support the ALJ's RFC findings.

### D. Plaintiff's PRW

The burden is on the claimant to demonstrate that she is unable to return to her PRW. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). While VE testimony at step four is not necessary to determine if a claimant can perform her PRW, the ALJ may consider VE testimony. *Wagner v. Astrue*, 499 F.3d 842, 853 (8th Cir. 2007). A VE's responses to a properly posed

hypothetical question at step four provides substantial evidence to support the ALJ's finding that an individual can perform her PRW.  *Depover,* 349 F.3d at 567.  The undersigned finds the ALJ's determination Plaintiff has the RFC to perform her PRW is supported by substantial evidence and in making that determination, the ALJ provided a sufficient basis for his determination.

The ALJ first asked the VE about the exertional demands and skill requirements of Plaintiff's PRW at Allied Canning and Butterball.  (Tr.75-76).  In response, the VE testified Plaintiff's work was as a poultry eviscerator and a cannery worker at the light unskilled level, and as a compression molding machine tenderer at the medium unskilled level. (Tr. 76).  The ALJ posed the following hypothetical question to the VE:

> So if you have a hypothetical individual, the same age, education, past work as [Plaintiff], who has no exertional limitations, but from a non-exertional standpoint is able to perform work where interpersonal contact is incidental to the work performed. The complexity of tasks is learned and performed by rote, with few variables, use of little judgment.  The supervision required is simple, direct and concrete.  Do you think such a hypothetical person could perform any of [Plaintiff's] past work either as she performed or as it's generally performed?

(Tr. 76).  In response, the VE testified this person could perform all of Plaintiff's PRW.  (Tr.76).

VE testimony, in response to a hypothetical question, is substantial evidence if the hypothetical sets forth the credible impairments with reasonable precision.  *See Starr v. Sullivan*, 981 F.2d 1006 (8th Cir. 1992).  The ALJ must only include in the hypothetical the impairments which the ALJ actually finds credible, and not those which he rejects, assuming his findings are supported by substantial evidence.  *See Onstad v. Shalala*, 999 F.2d 1232 (8th Cir. 1993).

Having thoroughly reviewed the hearing transcript, along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  *See e.g., Rappoport*

*v. Sullivan*, 942 F.2d 1320, 1322 (8th Cir. 1991). The VE's testimony constitutes substantial evidence Plaintiff could perform her PRW. *See Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005).

**IV. Conclusion:**

For the above reasons, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**Dated this 18th day of May, 2015.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
U.S. MAGISTRATE JUDGE